**Harold Lindsay DE FREECE, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 502–92.**

Court of Criminal Appeals of Texas, En Banc.

Feb. 24, 1993.

Mark Stevens, San Antonio, Martin Underwood, Comstock, for appellant.

Thomas F. Lee, Dist. Atty., Del Rio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Appellant was convicted by a jury of the offense of murder and his punishment assessed by the trial court at 60 years confinement in the penitentiary. On appeal he argued that the trial court erred in failing to appoint an expert to assist him in evaluation, preparation, and presentation of his insanity defense, in violation of his constitutional rights to due process, equal protection, effective assistance of counsel and compulsory process. The Eighth Court of Appeals disagreed, holding, *inter alia*, that appellant received all the expert assistance he was constitutionally entitled to under the provisions of Article 46.03, § 3, V.A.C.C.P. *De Freece v. State*, 829 S.W.2d 251 (Tex.App.—El Paso 1992). In his petition for discretionary review appellant reiterates his claim that under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), he was entitled to more than just the "disinterested experts" provided for by Article 46.03, § 3, supra. We granted the petition to address this claim. Tex.R.App.Pro., Rule 200(c)(2).

### I.

Appellant and the deceased, Juanita Rodriguez, had a five month old son. On the morning of February 17, 1989, appellant went to the home of Juanita's parents in Eagle Pass, where she and the baby were staying. Appellant was told by Juanita's sister that Juanita and her parents and brother had left that morning to drive to Pecos. Based upon statements he claimed Juanita's mother had made on prior occa-sions, appellant decided that the group intended to sell the baby in Pecos, and set out after them. He caught up with them on Highway 90 between Dryden and Sanderson, and ran them off the road. According to his testimony, at this time appellant heard voices he "couldn't overcome" which commanded him to "kill, kill." He forced Juanita into his car, where he stabbed her numerous times in the chest and abdomen, and then cut her throat. Texas Rangers apprehended him the next day a mile from the scene, and he readily confessed. The grand jury indicted him on March 20, 1989.

On June 23, 1989, the State filed a motion requesting that appellant be examined both for competency to stand trial and sanity at the time of the offense. Pursuant to Articles 46.02 and 46.03, V.A.C.C.P., the trial court ordered appellant sent to Vernon State Hospital "for observation, examination and treatment." There, Dr. D.F. Martinez, a psychiatrist, diagnosed him as suffering from "Schizophrenia, Chronic, Undifferentiated Type." Dr. F.E. Heynen, a clinical psychologist, opined that appellant was incompetent to stand trial, but that at the time of the offense he "had substantial capacity to appreciate the wrongfulness of his behavior and understood that his behavior was unlawful." On September 11, 1989, a jury found appellant presently incompetent, but capable of attaining competency in the foreseeable future; judgment to that effect was entered on September 13, 1989. Accordingly, appellant was returned to Vernon State Hospital, where he was re-evaluated every ninety days. See Article 46.02, §§ 4(g) & 5(c), supra. On December 7, 1989, and again on March 12, 1990, the hospital reported that appellant had not yet attained competency, apparently on recommendations from Dr. Martinez. Finally, on June 1, 1990, the trial court was notified that appellant was competent to stand trial, although Dr. Martinez advised that "he should continue his present medications consisting of neuroleptics and antidepressants."

On August 20, 1990, counsel for appellant filed a motion requesting the appointment of a psychiatric expert to assist in

preparing and presenting his insanity defense. The trial court took the motion under advisement. On September 18, 1990, counsel filed another motion urging his incompetency to try the case without expert assistance, and essentially requesting a continuance. A hearing was held during which counsel for appellant argued that the trial court had misconstrued his August 20 motion as a request for a specific expert. Counsel clarified that he sought no particular expert, but simply any competent psychiatrist who:

"would be a member of the defense team, would be available for helping preparation of the case, preparation for cross examination, deciding which tests were needed, range and form, that sort of thing, as well as being present during trial to help the defendant."

The trial court stated, *inter alia,* that "I've already appointed a psychiatrist to conduct an evaluation, and I don't feel I have to appoint another one[.]" Instead, the court assured appellant's counsel that he would be afforded an opportunity to interview Dr. Heynen, who was scheduled to testify for the State, prior to cross-examining her. Counsel for appellant complained that he

"[did] not believe the ability to speak to this one doctor solves the problem, because number one, she's already on record in writing as supporting the State's position, and number two, she will give no assistance in how to cross-examine her.... We think that we still need the expert on the defense team."

The trial court denied both appellant's motions.

Trial commenced that same day. Other than his testimony that he had heard voices commanding him to "kill, kill," appellant presented no direct evidence to show he was insane at the time of the offense. In rebuttal the State put Dr. Heynen on the witness stand to testify that any voices appellant may have heard would not be "sufficiently compelling to cause him to forget that this was a wrongful thing to do." After reading a number of reports from other clinics, conducting a battery of tests, and consulting with other staff members at Vernon State Hospital, she concluded that appellant had known the difference between right and wrong when he committed the offense. See V.T.C.A. Penal Code, § 8.01. After this testimony the trial court adjourned for the day, and Dr. Heynen assured the trial court that she would be available to consult with appellant's counsel.

The next morning counsel took Dr. Heynen on cross-examination. She agreed that appellant's records from his stay at Vernon State Hospital "weigh several pounds." Out of the presence of the jury appellant then renewed his motion for expert assistance to help him interpret those voluminous records with a view to cross-examining Dr. Heynen. Once again the trial court asked counsel:

"... Do you want to talk with [Dr. Heynen] some more if you have problems, because I think the lady would be happy to go over all this with you.

[DEFENSE COUNSEL]: Your Honor, my greatest need is to be able to impeach her testimony and to discredit it, and of course, she's not available for that. That's what I need for cross examination, so I see no benefit in talking to her.

THE COURT: I thought you said you were incompetent and couldn't understand these records.

[DEFENSE COUNSEL]: I am.

THE COURT: I'm offering, if she can help you with any terms or—she said she would stay over yesterday.

[DEFENSE COUNSEL]: My problem is to point out where she's wrong, Your Honor. I don't believe she's available for that."

The trial court again denied the motion.

As cross-examination continued, Dr. Heynen verified that Dr. Martinez had diagnosed appellant as suffering from undifferentiated schizophrenia, organic brain syndrome, and extreme psychosocial stressors. Dr. Heynen admitted that she herself had found that appellant had "diffuse organic brain damage." She believed his earlier history of commitment to mental hospitals, however, was "generally because of drug abuse." Disagreeing with Dr. Martinez'

evaluation of appellant as schizophrenic, Dr. Heynen opined that her own diagnostic skills "far exceed those of Dr. Martinez." She acknowledged that another doctor had earlier found in appellant "the capacity … to decompensate and to be a danger to himself and others." She pointed out, however, that this doctor did not "give any reason why he thought he had decompensated." On redirect examination Dr. Heynen noted several typical characteristics of schizophrenia (e.g., incoherence, impaired personal hygiene, "flat affect") that appellant did not manifest.

During final argument appellant's counsel conceded that the evidence showed appellant caused the death of Rodriguez. Emphasizing appellant's history of mental health commitments and his apparently delusional belief that Rodriguez' family intended to sell his baby, counsel argued that the jury should find that when appellant killed Rodriguez, he did not appreciate the wrongfulness of his conduct. In rebuttal, the State stressed Dr. Heynen's testimony that appellant could distinguish right from wrong when he committed the offense. After deliberating for five hours, the jury returned a guilty verdict.

The court of appeals held that failure of the trial court to grant appellant's persistent motions to appoint an independent psychiatric expert to assist him was not error. The reasoning of the court of appeals was threefold, as we understand it. First, the court of appeals observed that the trial court had appointed "disinterested experts" in accordance with Article 46.03, supra, which statutory scheme has been found by the United States Fifth Circuit Court of Appeals to satisfy constitutional requirements of *Ake v. Oklahoma*, supra.[1] See *Granviel v. Lynaugh*, 881 F.2d 185, at 191–92 (CA5 1989), *cert. denied*, 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990). Second, the court of appeals believed that by his "admirable" cross-examination of Dr. Heynen, counsel for appellant succeeded in impeaching her without the benefit of expert assistance. *De Freece v. State*, supra, at 255. Finally, the court of appeals faulted appellant for not subpoenaing Dr. Martinez, thereby obtaining what would likely have been favorable testimony without putting the trial court to the necessity of appointing an additional expert. *Id.*, at 256. We will address each of these reasons in turn.

## II.

In treating the court of appeals' first reason for rejecting appellant's *Ake* claim, we confront the question whether examination by "disinterested experts" at Vernon State Hospital, pursuant to Article 46.03, § 3(a), supra, and testimony from at least one of those experts at trial about conclusions she drew from that examination, were sufficient to meet the due process minimum announced in *Ake*. Appellant does not claim he was deprived of the opportunity to be examined by a competent expert on the question of sanity, as was Ake. He does claim, however, that, having shown his sanity would be a significant factor at his trial, he should have been provided an expert of the court's choosing to help him evaluate and prepare his sanity defense, and meaningfully confront expert testimony adduced by the State. We agree, and hold that the trial court erred in denying him that assistance.

Our analysis begins with a brief overview of Article 46.03, § 3(a), supra, and the Fifth Circuit's conclusion in *Granviel v. Lynaugh*, supra, that the neutral "court's expert" it provides is sufficient to comply with *Ake*. Next we review the decision in *Ake* itself, followed by an examination of what other jurisdictions have held regarding the scope of psychiatric assistance that *Ake* requires. Finally we explain our own understanding of the scope of psychiatric assistance under *Ake*, and apply that understanding to the facts of the instant case.

1. Of course, *Ake v. Oklahoma* was decided as a matter of federal due process. That the statutory scheme meets constitutional muster under *Ake* would not seem an adequate response to appellant's claims that he was also denied equal protection, effective assistance of counsel and compulsory process.

### Article 46.03

Before 1967 there was no express authority in Texas for appointing an expert to examine a criminal accused to determine either competency to stand trial or sanity at the time of the offense. For that reason this Court held that trial courts did not abuse their discretion in failing to do so. *Ellzey v. State*, 158 Tex.Cr.R. 604, 259 S.W.2d 211 (1953); *Crain v. State*, 394 S.W.2d 165 (Tex.Cr.App.1964). Nor did this Court perceive that the federal constitution required even so much as a state-sponsored examination for sanity, much less an expert for the express purpose of assisting the defense. *Crain v. State*, supra; *Bush v. State*, 172 Tex.Cr.R. 54, 353 S.W.2d 855 (1962), citing *United States ex rel. Smith v. Baldi*, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953).[2] By way of amendment to Article 46.02, supra, adding § 2(f)(1), the Legislature provided for the first time in 1967 that:

> "[t]he court may, at its discretion appoint disinterested qualified experts to examine the defendant with regard to his present competency to stand trial and to his sanity, and to testify thereto at any trial or hearing in connection to the accusation against the accused."

Acts 1967, 60th Leg., ch. 659, p. 1750, § 33, eff. August 28, 1967. In 1975 the Legislature enacted Article 46.03, supra, and placed the provision governing appointment of experts to determine sanity there, apart from provisions relating to competency to stand trial, which remained in Article 46.02, supra. See Acts 1975, 64th Leg., ch. 415, p. 1095, eff. June 19, 1975.

As of the time of trial in this cause, § 3(a) of Article 46.03, supra, read:

> "If notice of intention to raise the insanity defense is filed under Section 2 of this article, the court may, on its own motion or motion by the defendant, his counsel, or the prosecuting attorney, appoint disinterested experts experienced and qualified in mental health and mental retardation to examine the defendant with regard to the insanity defense and to testify thereto at any trial or hearing on the issue."

Under § 3(d) of Article 46.03, then as now, the appointed expert or experts must submit a written report to the trial court within thirty days detailing their "observations and findings pertaining to the insanity defense." The trial court is required to furnish a copy of the report to both the State and the defendant. Accordingly, we have characterized experts under these provisions as "not appointed by the court as the expert of the State or the defense, but [as] the court's disinterested witness." *Granviel v. State*, 552 S.W.2d 107, at 115 (Tex. Cr.App.1976). However, § 3(f) of Article 46.03, supra, requires the trial court to provide "a reasonable opportunity" for the accused "to be examined by a psychiatrist or other expert of his own choice[.]" While § 3(f) does not speak to the question whether, if the accused cannot afford an expert "of his own choice," one must be provided for him, we have indicated that counsel may obtain an expert to examine his indigent client by operation of Article 26.05, V.A.C.C.P. *Von Byrd v. State*, 569 S.W.2d 883, at 896 (Tex.Cr.App.1978).[3]

In *Granviel v. Lynaugh*, supra, the petitioner challenged the constitutionality of the Texas statutory scheme under *Ake v.*

---

**2.** Bush ultimately obtained relief in a federal habeas corpus petition, *Bush v. McCollum*, 231 F.Supp. 560 (N.D.Texas 1964), *aff'd*, 344 F.2d 672 (CA5 1965), but not before the cause on original appeal was remanded once by the United States Supreme Court, *Bush v. Texas*, 372 U.S. 586, 83 S.Ct. 922, 9 L.Ed.2d 958 (1963), and his claim once again rejected by this Court in *Bush v. State*, 372 S.W.2d 683 (Tex.Cr.App.1963).

**3.** But failure of the trial court to appoint a psychiatric expert is subject to the same abuse of discretion standard by which we measure any other failure to appoint an expert under

Article 26.05, supra. *Stoker v. State*, 788 S.W.2d 1, at 16–17 (Tex.Cr.App.1990); *Hammett v. State*, 578 S.W.2d 699, at 705–707 (Tex.Cr.App. 1979). And presumably counsel must have already "incurred" the expense of an independent examination of his client "with prior court approval" before Article 26.05 authorizes compensation. Cf. *Myre v. State*, 545 S.W.2d 820, at 826 (Tex.Cr.App.1977) (under former incarnation of Article 26.05, supra, defendant must show he "incurred" expense before he can be compensated); *Eggleston v. State*, 422 S.W.2d 460, at 463–64 (Tex.Cr.App.1968) (same).

*Oklahoma,* supra. The trial court had appointed a "disinterested expert" as per the statute to examine Granviel prior to trial, but refused to appoint another psychiatric expert at Granviel's request whose report would be unavailable to the State. The Fifth Circuit denied relief, holding that the Texas procedure was sufficient to comply with *Ake,* essentially because it believed that "[a]vailability of a neutral expert provides defendants with 'the raw materials integral to the building of an effective defense.'" 881 F.2d at 192, quoting *Ake v. Oklahoma,* 470 U.S. at 77, 105 S.Ct. at 1093, 84 L.Ed.2d at 62. We do not think careful consideration of *Ake,* with its emphasis on due process in the context of an adversarial system, bears this view out.

### Ake v. Oklahoma

Accused of capital murder, Glen Burton Ake displayed such odd behavior at his arraignment that the trial court ordered an examination to decide whether he should be observed to determine his competency to stand trial. The psychiatrist who examined Ake concluded he was a paranoid schizophrenic, and he was committed to a state hospital, where he was found incompetent. Six weeks later he was found to have regained competency, subject to continued treatment with an antipsychotic drug, Thorazine. Prior to trial his attorney indicated he would raise the defense of insanity, and requested psychiatric assistance, since Ake was indigent. Even though the state hospital had made no determination of Ake's sanity at the time of the offense, the trial court denied his request. *"As a result there was no expert testimony for either side on Ake's sanity at the time of the offense."* Ake v. Oklahoma, 470 U.S. at 72, 105 S.Ct. at 1091, 84 L.Ed.2d at 59.[4] The Oklahoma Court of Criminal Appeals affirmed Ake's conviction, holding that the State had no obligation to provide psychiatric services to indigents in capital cases.

The United States Supreme Court reversed Ake's conviction. In its opinion the Court began by reaffirming the principle that due process requires that the indigent accused in a criminal trial must be equipped with the "basic tools" to ensure "a proper functioning of the adversary process[.]" *Id.,* 470 U.S. at 77, 105 S.Ct. at 1093, 84 L.Ed.2d at 62. Deciding whether a psychiatric expert was necessary to that end, the Court considered three factors borrowed from cases involving questions of procedural due process, *viz:*

> "The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided."

*Id.* The accused's interest in maintaining the institutional presumption of innocence, the Court observed, "is obvious." The State, on the other hand, has more than the ordinary adversarial interest in prevailing; it has a concomitant interest in the fairness of the proceeding and the accuracy of the result. Moreover, because most states already provide some level of psychiatric assistance to the accused, that burden cannot be prohibitive. In these lights the Court concluded that the State's interest "is not substantial[.]" *Id.,* 470 U.S. at 79, 105 S.Ct. at 1094, 84 L.Ed.2d at 63–64.

Assessing the third factor, the Court began "by considering the pivotal role that psychiatry has come to play in criminal proceedings." *Id.*

> "In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge and jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychia-

---

4. Emphasis in the original. All other emphasis supplied unless otherwise indicated.

trists and how to interpret their answers."

*Id.*, 470 U.S. at 80, 105 S.Ct. at 1095, 84 L.Ed.2d at 64. Thus, psychiatric experts may assist lay judges and jurors to make an informed decision about the sanity of the accused at the time of the offense. Because psychiatry is not "an exact science," however, juries remain the "primary factfinders," and, the Court suggested, it is important that the jury hear "the psychiatrists for each party" to equip it to make as informed a decision as possible. *Id.*, 470 U.S. at 81, 105 S.Ct. at 1095, 84 L.Ed.2d at 65. To avoid the risk of an inaccurate verdict, the Court concluded, an indigent accused must be provided an expert "to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses[.]" *Id.*, 470 U.S. at 82, 105 S.Ct. at 1096, 84 L.Ed.2d at 65.

The Court concluded:

"We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. That is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right."

*Id.*, 470 U.S. at 83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66.[5]

### Persuasive Authority

Commentators have noted an "ambiguity" in *Ake*, a seeming internal contradiction between the express right to a single competent psychiatric expert not of the accused's choosing, on the one hand, and indications throughout the opinion, on the other, that the accused is entitled to an expert who will participate with him as a partisan in the case. E.g., Note, Due Process and Psychiatric Assistance: Ake v. Oklahoma, 21 Tulsa L.J. 121, at 143–46 (1985); Note, Expert Services and the Indigent Criminal Defendant: The Constitutional Mandate of Ake v. Oklahoma, 84 Mich.L.Rev. 1326, at 1345–57 (1986). Some courts have targeted the first aspect of *Ake* to hold that a single "neutral" expert is all the State need supply to ensure proper adversarial functioning. Thus, many courts have denied *Ake* claims where the accused has received an examination in a state mental institution pursuant to court order, holding that the state-sponsored examination met all due process requirements. E.g., *Beard v. State*, 306 Ark. 546, 816 S.W.2d 860 (Ark.1991); *State v. Hoopii*, 68 Haw. 246, 710 P.2d 1193 (1985); *Djadi v. State*, 72 Md.App. 223, 528 A.2d 502 (1987); *Willie v. State*, 585 So.2d 660 (Miss.1991); *State v. Hix*, 38 Ohio St.3d 129, 527 N.E.2d 784 (1988); *State v. Indvik*, 382 N.W.2d 623 (N.D.1986). In each of these cases, however, the state institution had found no reason to doubt the defendant's sanity, and therefore the court also found the defendant had not shown insanity would be a significant factor at trial in any event. Many other courts have held similarly that, where a state-sponsored examination reveals no likelihood of insanity at the time of the offense, a defendant has not met the threshold requirements for relief under *Ake*. E.g., *Simmons v. Commonwealth*, 746 S.W.2d 393 (Ky.1988); *State v. Barrett*, 577 A.2d 1167 (Me.1990); *State v. Robinson*, 327 N.C. 346, 395 S.E.2d 402 (1990); *Tuggle v. Commonwealth*, 230 Va. 99, 334 S.E.2d 838 (1985); *State v. Newcomer*, 48 Wash.App. 83, 737 P.2d 1285 (1987); *Glass v. Blackburn*, 791 F.2d 1165 (CA5 1986); *United States v. Fazzini,* 871 F.2d 635 (CA7 1989); *Cart-*

---

**5.** This Court does not understand the holding of *Ake* to be limited to the context of capital offenses. See *McBride v. State,* 838 S.W.2d 248 (Tex.Cr.App.1992).

*wright v. Maynard,* 802 F.2d 1203 (CA10 1986); *Bowden v. Kemp,* 767 F.2d 761 (CA11 1985). Every court that has found the defendant did make an adequate showing that insanity would be a significant factor, however, has also held that *Ake* entitled him to more than an examination and testimony, if favorable, from a neutral psychiatric expert—every court, that is, except the Fifth Circuit in *Granviel v. Lynaugh,* supra.

In *Lindsey v. State,* 254 Ga. 444, 330 S.E.2d 563 (Ga.1985), evidence that the defendant had a history of mental problems, and had been diagnosed as a paranoid schizophrenic and prescribed anti-psychotic medications, was held sufficient to show his sanity at the time of the offense would be a significant factor at trial. The Supreme Court of Georgia therefore reversed the conviction on authority of *Ake.* Responding to the State's contention that access to and the opportunity to confer with a neutral expert would be enough to satisfy *Ake,* the court concluded that "in addition to examining the defendant, the psychiatrist must assist the defense by aiding defense counsel in the cross-examination and rebuttal of the state's medical experts." *Id.,* 330 S.E.2d at 567. See also *Holloway v. State,* 257 Ga. 620, 361 S.E.2d 794 (Ga. 1987).

In *Palmer v. Indiana,* 486 N.E.2d 477 (Ind.1985), the Supreme Court of Indiana examined its statutory scheme for providing expert examination for insanity claimants. Under Indiana law, upon notice of an insanity defense, the trial court is automatically to appoint at least two medical experts, one of whom must be a psychiatrist, to examine the defendant. The court recognized that one requirement of *Ake* is that defense counsel be provided with an expert with whom to consult "about the validity of observations being made by other witnesses." *Id.,* at 482. Accordingly, the court directed that its statutory scheme be implemented with the understanding that the appointed psychiatrist "be available for consultation with counsel during preparation for trial." *Id.*

The defendant in *State v. Gambrell,* 318 N.C. 249, 347 S.E.2d 390 (1986), was found to be in need of psychiatric care, and was committed to a state hospital for determination of his capacity to stand trial. The examining psychiatrist's initial impression was that the defendant was "probably schizophrenic," and he was medicated with psychotropic drugs. Ultimately the psychiatrist found him both competent and sane. Nevertheless, in view of the initial skepticism about Gambrell's mental condition, along with some indication of mental illness in his family history, the Supreme Court of North Carolina concluded he had shown that his sanity would be a significant factor at trial. Holding that a state-sponsored psychiatric expert was acceptable under *Ake,* the court reversed the conviction nevertheless because the defendant had obtained only an examination by the state psychiatrist, but had received no aid in "evaluating, preparing, and presenting his defense at both the guilt and sentencing phases." *Id.,* 347 S.E.2d at 395.

The federal courts of appeals have also been inclined to hold that defendants who meet the threshold showing of *Ake* are entitled to more than a "neutral" testifying expert. *Smith v. McCormick,* 914 F.2d 1153, at 1158–59 (CA9 1990). In *United States v. Sloan,* 776 F.2d 926 (CA10 1985), the trial court appointed a psychiatrist to report to the court after an examination to determine competency and sanity of the defendant. The examiner reported that Sloan "suffered from a borderline schizoid personality," but that he was both competent and sane. Sloan requested a defense psychiatrist to help him understand the examining psychiatrist's report and to prepare to cross-examine him at trial, which was denied. The Court of Appeals reversed the conviction, holding that without the aid the defendant had requested, he was deprived of due process. Along the way the Court of Appeals observed, "The essential benefit of having an expert in the first place is denied the defendant when the services of the doctor must be shared with the prosecution." *Id.,* at 929. See also *United States v. Crews,* 781 F.2d 826

(CA10 1986); *Liles v. Saffle*, 945 F.2d 333 (CA10 1991).

In *Cowley v. Stricklin*, 929 F.2d 640 (CA11 1991), the state trial judge had committed the defendant to mental institutions on three occasions before he was prosecuted for sexual assault. An earlier diagnosis found he suffered from schizophrenia, but at the state mental health facility he was found competent to stand trial and mentally responsible for the offense. The court refused Cowley's request for an appointed expert, despite representations from a psychologist who had volunteered his services and examined Cowley briefly, that he was still schizophrenic. On federal habeas corpus, Alabama argued that because the defendant had had access to the reports of the state psychiatrist, and help from the volunteer psychologist, there was no *Ake* violation. The Court of Appeals rejected these contentions, observing that the state's psychiatrist "did not assist in Cowley's trial preparation and obviously could not have assisted Cowley in his own cross-examination." *Id.*, at 644. Moreover, the psychologist had not interviewed Cowley in any depth in ten years, and had not been able to form an opinion as to his sanity at the time of the offense. Cowley's conviction was reversed and remanded to the state court for retrial or release. See also *Buttrum v. Black*, 721 F.Supp. 1268 (N.D.Ga.1989), *aff'd*, 908 F.2d 695 (CA11 1990).

Thus, it is true that some jurisdictions have said, essentially in dicta, that the statutory provision of a single neutral psychiatrist to service both parties and the court is sufficient to meet the due process minimum of *Ake*.[6] However, it appears that, *Granviel v. Lynaugh*, supra, notwithstanding, the greater weight of authority holds otherwise. And, in our view, with good reason.

### Ake and Article 46.03

Ours is an adversarial system of criminal justice, not an inquisitorial one. Either mode of inquiry is aimed at assessing the truth. However, the adversarial model rests on the assumption that each party to a dispute, motivated by self-interest, will develop his position to the greatest extent possible within the boundaries of the rules of evidence and procedure, thus providing the factfinder an optimal vantage from which to gauge all relevant facts and make an informed decision on the merits. In *Ake* the Supreme Court reiterated that where the defendant is indigent, due process requires that the State guarantee he be at least minimally equipped to participate meaningfully in this adversarial process.

Where sanity of the indigent accused will be a significant factor at trial, psychiatry has come to play a "pivotal role." 470 U.S. at 79, 105 S.Ct. at 1094, 84 L.Ed.2d at 64. But since psychiatry "is not ... an exact science," equally competent practitioners confronted with the same raw data often disagree in their diagnoses in an area that is "inevitably complex and foreign" to lawyers and juries alike. 470 U.S. at 81, 105 S.Ct. at 1095, 84 L.Ed.2d at 64–65. Although psychiatric testimony is undoubtedly useful in the resolution of many issues in the adversary trial context, including sanity at the time of the offense:

> "[n]one of these issues ... can be addressed by a psychiatrist with absolute certainty. Thus, to expect the 'objective' opinion of an amicus expert to yield 'the answer' in a particular case is unrealistic. Unless the choices made by the psychiatrist in the establishment and proof of

---

6. The State argues that denial of petition for writ of certiorari in *Granviel v. Lynaugh*, supra, 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990), shows that the Supreme Court endorses the view that examination by a neutral psychiatrist satisfies *Ake*. But the denial of a petition for writ of certiorari has no more precedential value than does the refusal of a petition for discretionary review in this Court. E.g., *Hopfmann v. Connolly*, 471 U.S. 459, 105 S.Ct. 2106, 85 L.Ed.2d 469 (1985). Nor do two other cases cited by the State in which petitions for writ of certiorari were denied, *viz: Glass v. Blackburn*, 791 F.2d 1165 (CA5 1986), *cert. den.*, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987), and *State v. Vickers*, 159 Ariz. 532, 768 P.2d 1177 (1989), *cert. den.*, 497 U.S. 1033, 110 S.Ct. 3298, 111 L.Ed.2d 806 (1990), even stand for the proposition, as we understand them, that examination by a neutral psychiatrist is all that due process requires.

his or her hypothesis are open to informed scrutiny, the psychiatrist's conclusions are of limited value. And, unless each party has access to psychiatric assistance in preparing and directing this scrutiny, it cannot be expected that the scrutiny will be adequately informed. Indeed, each party must have the opportunity to explore and explain the relevant psychiatric data in a case if the conclusions drawn from these data are properly to be understood by the judge or the jury and the 'truth' is to be most closely approximated. This is the teaching of *Ake v. Oklahoma.*"

Showalter & Fitch, Objectivity and Advocacy in Forensic Psychiatry After Ake v. Oklahoma, 15 J. Psychiatry & L., 177, at 186 (1987). Because psychiatric evidence is at once esoteric and uncertain, the indigent accused needs a psychiatrist, *inter alia*, "to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witness," if he is to present the factfinder with a perspective broad enough to ensure an informed resolution of the sanity question. 470 U.S. at 82, 105 S.Ct. at 1096, 84 L.Ed.2d at 65. Otherwise the risk of error is intolerably high, and due process will be offended.

In *Granviel v. State*, supra, at 115, we called the "disinterested experts" contemplated by former Article 46.02, § 2(f)(1), now Articles 46.02, § 3(a) & 46.03, § 3(a), "the court's ... experts." See also *Von Byrd v. State*, supra, at 896. We reject the notion that a "court's expert" necessarily fulfills the role of psychiatric assistant to the indigent accused envisioned by *Ake*. Such a "court's expert" may well serve an important function in identifying whether sanity will be a significant factor at trial. But in an adversarial trial itself, judge and jury necessarily play a passive, neutral role. In that context the phrase "court's expert" is an oxymoron. It is the parties, not the judge, who supply evidence from which the jury is to distill the truth. And while it is true, as the Fifth Circuit echoes in *Granviel v. Lynaugh*, supra, at 191, that "[a] psychiatrist's examination is not an adversary proceeding[,]" the trial at which the State adduces evidence of that examination most certainly is.

■ In an adversarial system due process requires at least a reasonably level playing field at trial. In the present context that means more than just an examination by a "neutral" psychiatrist. It also means the appointment of a psychiatrist to provide technical assistance to the accused, to help evaluate the strength of his defense, to offer his own expert diagnosis at trial if it is favorable to that defense, and to identify the weaknesses in the State's case, if any, by testifying himself and/or preparing counsel to cross-examine opposing experts. We recognize that the accused is not entitled to a psychiatrist of his choice, or even to one who believes the accused was insane at the time of the offense. *Ake* makes this much clear. But even a psychiatrist who ultimately believes the accused was sane can prove invaluable by pointing out contrary indicators and exposing flaws in the diagnoses of State's witnesses.

None of this is to say that Article 46.02, § 3(a), supra, is unconstitutional. As in other jurisdictions, a preliminary examination by "disinterested experts" under this provision may show insanity is not to be a significant factor in the case. In that event the due process right articulated in *Ake* would not be triggered. Where that examination shows a viable insanity claim, however, due process does not end there. The accused must be given the means to advance that claim at trial. Thus, more than the appointment of "disinterested experts" under Article 46.03, supra, is required. Once it is shown that insanity will be a significant factor at trial, the trial court abuses its discretion in failing to appoint, or to give "prior ... approval" to "reasonable expenses incurred" by counsel for the accused to obtain, a competent psychiatrist to assist in the evaluation, preparation and presentation of his insanity defense. Article 26.05(a), supra.

### Application of Ake

■ The State does not contest that in this cause appellant demonstrated to the

trial court that insanity would be a significant factor at trial, as indeed it turned out to be. The facts of the offense itself are fairly bizarre, as the trial court would have been aware at least by the time he denied appellant's latest request for expert assistance. The State itself questioned both his sanity and his competency to stand trial, and he was indeed found to be incompetent. He did not attain competency for another eight months, and then, only subject to continued medication. While the only opinion expressed prior to trial as to his sanity at the time of the offense, from the clinical psychologist, Dr. Heynen, is that he was sane, the treating psychiatrist, Dr. Martinez, believed him to be schizophrenic. He had a significant history of commitment in mental health facilities. These facts conduce to show, no less than those in *Ake*, 470 U.S. at 86, 105 S.Ct. at 1098, 84 L.Ed.2d at 68, that insanity was not only a significant factor at trial, it was the only contested issue. See also, e.g., *Gambrell v. State*, supra; *United States v. Sloan*, supra; *Cowley v. Stricklin*, supra. And in fact counsel conceded in final argument that his client caused the death of Rodriguez, arguing only that he had not perceived his conduct to be wrong.

Counsel for appellant did not ask for anything more than he was minimally entitled to under *Ake*. He did not request a particular psychiatrist, but only a single competent one. Nor did he seek a psychiatrist who would necessarily testify that his client was insane at the time of the offense. He simply sought expert guidance in evaluating the strength of appellant's defense, presenting it in the best possible light to the jury, and, in particular, in scrutinizing the testimony of Dr. Heynen, the only expert opinion then available that directly addressed the question of appellant's ability to distinguish right from wrong. Even a neutral "court's expert" cannot effectively prepare counsel to cross-examine herself. *Cowley v. Stricklin* supra; *Buttrum v. Black*, supra. We hold that the trial court erred in denying appellant's request for the appointment of a psychiatrist to aid in the preparation and presentation of his insanity defense.

### III.

■ The court of appeals believed counsel was able to conduct an "admirable" cross-examination of Heynen without the benefit of psychiatric assistance. As appellant notes, this smacks of a harmless error analysis. But in *Ake* itself the Supreme Court reversed the conviction and remanded the cause for new trial without conducting a harm analysis. See *Vickers v. Arizona*, 497 U.S. 1033, at 1036, 110 S.Ct. 3298, at 3300, 111 L.Ed.2d 806, at 809 (1990) (Marshall, J., dissenting to denial of petition for writ of certiorari). In any event, we would not conclude that the error in failing to appoint a psychiatrist to consult with counsel was harmless error in this cause. First, help in preparing to cross-examine State's witnesses is not the only function of an appointed psychiatrist contemplated by *Ake*. Even if it were, that counsel did an "admirable" job in cross-examining Heynen does not mean he could not have done an even more effective job with the aid of an expert to interpret the voluminous data from Vernon State Hospital from which her opinion was derived. Especially considering that, although the only contested issue at trial was sanity, the jury nevertheless deliberated for five hours before convicting appellant, we could not say beyond a reasonable doubt that the failure to appoint the requested expert did not contribute to the verdict in this cause.

### IV.

■ Finally, the court of appeals believed appellant could have obtained all the succor to which he was constitutionally entitled by subpoenaing Dr. Martinez to testify at trial. We disagree. To begin with, once it is shown that insanity will be a significant factor at trial, more than just favorable psychiatric testimony—if that is even available—is required to fully satisfy *Ake*.[7] Martinez was not present to help

---

7. Again, we do not suggest that *Ake* guarantees appointment of an expert who will testify that the accused is insane. But once it is shown that insanity will be a significant factor at trial,

counsel interpret the hospital records or critically examine Heynen's conclusions for purposes of cross-examining her (even had he been inclined to do so, considering that they were colleagues). For counsel to have elicited an opinion from Martinez before trial, without first obtaining his appointment or the provision of funds to hire him as a *defense* expert, would have risked generating another witness for the State, should Martinez' ultimate opinion on the issue of insanity prove to be unfavorable.[8] That Martinez believed appellant to be a schizophrenic was already before the jury. We cannot agree that counsel's failure to risk calling Martinez to the witness stand should operate to nullify his right under *Ake* to the aid and consultation of a psychiatric expert. See *Cowley v. Stricklin,* supra, at 644–45; *State v. Moore,* 321 N.C. 327, 364 S.E.2d 648, at 653–54 (1988).

### V.

We therefore reverse the judgment of the court of appeals and remand the cause for new trial.[9]

McCORMICK, P.J., concurs in the result.

WHITE, J., dissents.

---

appellant is entitled to the appointment of a psychiatric expert. If the appointed psychiatrist believes the accused was insane, he may certainly so testify. But even if he does not, he must be made available to consult with counsel, to interpret records, to prepare counsel to cross-examine State's witnesses, and generally to help present appellant's defense in the best light.

8. Until such time as Martinez may be appointed by the court as a *defense* expert, he would remain, under Article 46.03, supra, a "court's expert," and as such, not subject to the attorney-client privilege. *Granviel v. State,* supra, at 115. But had the trial court appointed him as a

---

defense expert, Martinez would have been a "representative of the lawyer," i.e., "one employed by the lawyer to assist the lawyer in the rendition of professional legal services[.]" Tex. R.Cr.Evid., Rule 503(a)(4). As such he could be prevented "from disclosing any ... fact which came to [his] knowledge ... by reason of the attorney client relationship." Tex.R.Cr.Evid., Rule 503(b).

9. In view of this disposition, we need not address other matters in the court of appeals' opinion. See n. 1, *ante.*